## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

|  |  |
|---|---|
| AMY HICKS,<br><br>          Plaintiff,<br><br>     v.<br><br>ILLINOIS DEPARTMENT OF CORRECTIONS, WEXFORD HEALTH SOURCES, INC., STEVEN BOWMAN, LISA JOHNSON, MELINDA EDDY, VIDYA SAGAR RAO MORISETTY, CASSIE ESTES, RICHARD LEDBETTER, SUSAN COX, MICHAEL THOMACK, AND CHELSEY O'BRYAN,<br><br>          Defendants. | Case No. 3:26-cv-03006<br><br>**Jury Trial Demanded**<br><br>**Equitable Relief Is Sought** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Amy Hicks, by and through her undersigned counsel, files this Complaint against the Illinois Department of Corrections, Wexford Health Sources, Inc., Steven Bowman, Lisa Johnson, Melinda Eddy, Vidya Sagar Rao Morisetty, Cassie Estes, Richard Ledbetter, Susan Cox, Michael Thomack, and Chelsey O'Bryan (collectively, "Defendants"), and alleges as follows:

### INTRODUCTION

1.      Almost from the moment Amy Hicks entered Logan Correctional Center during the third trimester of her pregnancy, one prison staffer and medical provider after another told her she would have her labor induced, whether or not she wanted or needed it. They made it clear to her that this was the prison's policy and practice for all pregnant inmates, and she had no say in the matter.

2.      On or about January 9, 2024, Plaintiff entered Illinois Department of Corrections custody well into her third pregnancy. As she had with her prior pregnancies, Plaintiff wished to

begin labor spontaneously, when her baby was ready.

3.      However, Defendants made it abundantly clear to Plaintiff that she had no choice: she would be scheduled for an induction of labor prior to her due date, at a date and time of the prison's selection, pursuant to prison policy and practice. Plaintiff never consented to induction and repeatedly raised objections to doctors, nurses, guards, counselors, and other Illinois Department of Corrections and Wexford Health Sources employees both verbally and in writing.

4.      The threat of having her labor induced against her will caused Plaintiff immense stress, anxiety, and depression during the remainder of her pregnancy.

5.      Despite Plaintiff's repeated protests, Defendants forced Plaintiff to undergo induction of labor against her will and without medical need on or about February 12, 2024, two weeks before her estimated due date. The forced induction was painful, physically violating, and emotionally traumatizing.

6.      This complaint, brought pursuant to the Illinois Reproductive Health Act and 42 U.S.C. § 1983, arises from the actions of Defendants, who unlawfully and deliberately caused Plaintiff to experience induction of her labor against her will and without medical need, despite her explicit and repeated pleas not to be induced.

7.      Plaintiff seeks to redress the deprivations of her right to make autonomous decisions about her maternity care under the Illinois Reproductive Health Act and her substantive due process right to refuse medical treatment under the Fourteenth Amendment, both of which Defendants violated by forcing the induction of her labor against her will and without medical need.

8.      Pursuant to the Illinois Reproductive Health Act and 42 U.S.C. § 1983, Plaintiff seeks declaratory relief, compensatory and punitive damages, attorneys' fees and costs, and any

other relief this Court deems just and appropriate.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this action presents federal questions and seeks to redress the deprivation of rights under the Fourteenth Amendment to the U.S. Constitution. This Court has supplemental jurisdiction over the state law claim asserted in this action pursuant to 28 U.S.C. § 1367.

10.    Venue is proper in the Central District of Illinois because the events giving rise to the claims asserted herein occurred within this District. 28 U.S.C. § 1391(b)(2).

11.    This Court is authorized to grant declaratory relief under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

## PARTIES

12.    Plaintiff Amy Hicks, whose maiden name is Amy Cox, is an individual currently residing in Madison County, Illinois. From on or about January 9, 2024 until February 12, 2024, Plaintiff was incarcerated at Logan Correctional Center ("Logan") in Lincoln, Illinois. From on or about February 14, 2024 until June 5, 2024, Plaintiff was incarcerated at Decatur Correctional Center ("Decatur") in Decatur, Illinois. During the events that gave rise to this lawsuit, Plaintiff's last name was Cox and her inmate number was Y53222.

13.    The Illinois Department of Corrections ("IDOC") is the department of the Illinois state government that operates the adult state prison system, including Logan. IDOC is headquartered in Springfield, Illinois.

14.    On information and belief, Defendant Wexford Health Sources, Inc. ("Wexford") is a corporation incorporated under the laws of the state of Florida with its principal place of business in Pittsburgh, Pennsylvania. At the time of the events giving rise to the claims asserted

herein, Wexford contracted with IDOC to provide medical care to inmates incarcerated in all IDOC correctional facilities, including Logan. Wexford was, in all acts and omissions alleged herein, acting under color of state law.

15.      On information and belief, Defendant Steven Bowman, M.D. was, at the time of the events giving rise to the claims asserted herein, the Medical Director for IDOC. On information and belief, as Medical Director, Dr. Bowman oversaw the medical services for all IDOC correctional centers, provided medical direction to Wexford and IDOC medical staff, and oversaw the contract between IDOC and Wexford. On information and belief, Dr. Bowman was ultimately responsible for all healthcare policy for IDOC inmates. Dr. Bowman was, in all acts and omissions alleged herein, acting under color of state law. Dr. Bowman is sued in his individual capacity.

16.      On information and belief, Defendant Lisa Johnson was, at the time of the events giving rise to the claims asserted herein, the IDOC Office of Health Services Central Region Coordinator. On information and belief, Defendant Johnson was responsible for overseeing employee training and orientation for on-site medical providers, including Wexford employees and contractors, for all IDOC prisons in the Central Region, which includes Logan. On information and belief, Defendant Johnson was responsible for addressing all medical policy changes, problems, and challenges that arose in the Central Region, including at Logan. Defendant Johnson was, in all acts and omissions alleged herein, acting under color of state law. Defendant Johnson is sued in her individual capacity.

17.      On information and belief, Defendant Melinda Eddy was, at the time of the events giving rise to the claims asserted herein, the Acting Warden of Logan and the IDOC Chief of Women and Family Services. On information and belief, as Warden, Defendant Eddy was ultimately responsible for the administration, policies, and practices of Logan, including the

provision of healthcare to inmates. On information and belief, as the Chief of Women and Family Services, Defendant Eddy oversaw all programs and policies for pregnant inmates. Defendant Eddy was, in all acts and omissions alleged herein, acting under color of state law. Defendant Eddy is sued in her individual capacity.

18.    On information and belief, Defendant Vidya Sagar Rao Morisetty, M.D. was, at the time of the events giving rise to the claims asserted herein, an obstetrician and gynecologist providing medical care to IDOC inmates on behalf of Wexford, including Plaintiff while she was incarcerated at Logan. Dr. Morisetty was, in all acts and omissions alleged herein, acting under color of state law. Dr. Morisetty is sued in his individual capacity.

19.    On information and belief, Defendant Cassie Estes was, at the time of the events giving rise to the claims asserted herein, a nurse providing medical care to IDOC inmates on behalf of Wexford, including Plaintiff while she was incarcerated at Logan. Nurse Estes was, in all acts and omissions alleged herein, acting under color of state law. Nurse Estes is sued in her individual capacity.

20.    On information and belief, Defendants Richard Ledbetter, Susan Cox[1], Michael Thomack, and Chelsey O'Bryan were correctional officers or other IDOC staff at Logan who were personally involved in the events that caused the deprivation of Plaintiff's rights under federal and state law. On information and belief, Defendant Ledbetter was a correctional officer stationed on or around Plaintiff's housing blocks. On information and belief, Defendants Cox and Thomack were correctional officers who took Plaintiff to the hospital for the forced induction of her labor, and Officer Cox also took Plaintiff to other off-site doctor's appointments. On information and belief, Defendant O'Bryan was a correctional counselor for Plaintiff's housing block. Defendants

---

[1] On information and belief, Officer Susan Cox has no relation to Plaintiff.

Ledbetter, Cox, Thomack, and O'Bryan were, in all acts and omissions alleged herein, acting under color of state law. Defendants Ledbetter, Cox, Thomack, and O'Bryan are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### A. Before Her Forced Induction While in IDOC Custody, Plaintiff Delivered Two Healthy Babies Through Spontaneous Labor.

21.     On November 9, 2019, Plaintiff gave birth to her first child, a girl, through spontaneous vaginal delivery. Plaintiff's first baby was born with no complications and is a generally healthy child.

22.     On November 15, 2020, Plaintiff gave birth to her second child, a son, also through spontaneous vaginal delivery. Plaintiff's son was born missing one of his kidneys, but his delivery and birth were otherwise uncomplicated, and he is also a generally healthy child.

23.     During her first two pregnancies, Plaintiff experienced common, mild pregnancy symptoms like low iron, headaches, and nausea, but no serious complications. She was never diagnosed with high blood sugar, prediabetes, or gestational diabetes at any time during these first two pregnancies. She also had never been diagnosed with high blood sugar, prediabetes, or Type 1 or Type 2 diabetes outside of her pregnancies.

24.     No medical provider ever recommended that Plaintiff undergo a scheduled induction of labor during her first two pregnancies. During her first pregnancy, doctors asked Plaintiff if she wanted her water broken manually at the hospital. Plaintiff refused to have her water broken manually. Her care team at that time respected her wishes, and Plaintiff's water broke spontaneously at the hospital while she was in labor. During Plaintiff's second pregnancy, her water also broke spontaneously at the hospital while she was in labor.

B. **Plaintiff Was Pregnant When She Entered IDOC Custody in January of 2024.**

25.      In the middle of 2023, Plaintiff learned that she was pregnant with her third child. At that time and throughout this pregnancy, Plaintiff experienced typical pregnancy symptoms. Plaintiff did not experience any unusual symptoms or notice any differences between this pregnancy and her two prior pregnancies in terms of her physical condition.

26.      On or around December 6, 2023, Plaintiff visited Mosaic Health, a limited-services pregnancy resource center in Granite City, Illinois, where she received an ultrasound.

27.      On or around January 9, 2024, Plaintiff entered IDOC custody at Logan Correctional Center.

28.      On or around January 11, 2024, medical staff administered a comprehensive metabolic panel as part of Plaintiff's intake at Logan. Her blood glucose levels were measured at 67 milligrams per deciliter, which was within the normal range. Plaintiff's blood was also tested for A1C, which reflects a person's average blood sugar levels over the past 2–3 months. Her result was 5.6%, which was likewise within the normal range.

29.      On or around January 12, 2024, Plaintiff had her first medical appointment with Dr. Morisetty. Dr. Morisetty noted on Plaintiff's chart that her estimated due date was February 26, 2024, based on the ultrasound she had previously received at Mosaic Health. He also documented that Plaintiff had "good fetal movements" and "no other complaints." Dr. Morisetty did not note any complications or concerns with Plaintiff's pregnancy.

C. **Multiple Wexford and IDOC Staff Told Plaintiff That Prison Policy Required Induction of Labor, and Plaintiff Repeatedly Objected to Being Induced.**

30.      Within days of arriving at Logan on or around January 9, 2024, Logan staff informed her that it was the prison's policy that all pregnant inmates would be scheduled for induction of labor, in lieu of waiting for spontaneous labor.

31.     First, while Plaintiff was in X House, the transitional housing block for new inmates before they are assigned to their permanent housing placement, Plaintiff heard from another inmate that all pregnant inmates had to have their labor induced. Plaintiff asked correctional officers stationed in X House at that time if this was true, and Officer Ledbetter confirmed to Plaintiff that scheduled inductions were "what we [i.e., the prison] do."

32.     Further, when Dr. Morisetty first examined Plaintiff on January 12, 2024, he informed Plaintiff that every pregnant inmate at Logan receives a scheduled date for induction of labor. He also informed Plaintiff that she would be scheduled for induction before her due date. At this appointment, Dr. Morisetty did not advise that an induction was medically necessary for Plaintiff, nor did he give any justification based on Plaintiff's health or individual medical history for scheduling an induction.

33.     Plaintiff strongly desired to go into labor naturally and did not want her labor to be artificially induced—especially not prior to her due date. Plaintiff was scared of being induced because her own mother had experienced a still birth after induction. In addition to fearing harm to her child and herself from induced labor, Plaintiff had begun the process of applying for a transfer to IDOC's "Moms and Babies" prison nursery program at Decatur so that she would be able to keep her newborn child with her while she completed her sentence. Plaintiff knew it could take a significant amount of time to make those transfer arrangements, and she was afraid her child would end up in foster care if she could not finalize the arrangements to transfer to the "Moms and Babies" program before giving birth.

34.     Plaintiff never wavered from her unequivocal desire not to be induced and objected to induction at every opportunity.

35.     At the appointment on or around January 12, 2024, Plaintiff asked Dr. Morisetty if

she could avoid being induced. He responded that scheduled induction of labor was the policy for all pregnant inmates at Logan—regardless of individual medical need or consent—and that there were no exceptions. Hearing this, Plaintiff started crying. Plaintiff told Dr. Morisetty at that appointment that she did not want to be induced.

36.     Plaintiff subsequently asked a nurse who worked with Dr. Morisetty, Cassie Estes, if she really had to be induced. Nurse Estes told Plaintiff that it had been the policy at Logan for years to schedule induction of labor for all pregnant inmates.

37.     Plaintiff repeatedly told Dr. Morisetty, Nurse Estes, and other Wexford and/or IDOC staff who were present at her prenatal appointments at Logan that she did not want to be induced.

38.     Plaintiff also asked other prison medical personnel if she was truly required to be induced. They all told her the same thing: it was prison policy that all pregnant inmates would be scheduled for induction of labor.

39.     For example, on or around January 16, 2024, Plaintiff saw Carol Flippen, M.D., a psychiatrist providing mental health care at Logan, for an evaluation. When Plaintiff told Dr. Flippen that she did not want to have her labor induced, Dr. Flippen informed Plaintiff it was prison policy to schedule induction of labor for all pregnant inmates.

40.     At that appointment, Dr. Flippen suggested that Plaintiff submit a grievance indicating that she did not want to have her labor induced. Plaintiff did so shortly thereafter by placing her handwritten grievance in a dedicated box in her housing unit.

41.     Plaintiff eventually attended a meeting with the correctional counselor for the permanent housing block to which she was assigned (Housing Block 6), Counselor O'Bryan, and asked about her grievance regarding induction. At this meeting, Counselor O'Bryan told Plaintiff

that she could not "pick and choose" how to deliver her baby because she was in prison. Upon information and belief, Counselor O'Bryan did not take any action to address or escalate Plaintiff's objection to having her labor induced.

42.     After her meeting with Counselor O'Bryan, Plaintiff received a written response denying her grievance and stating that no further action would be taken. Plaintiff subsequently escalated her grievance by checking a box asking for additional review on the grievance form and placing the form in the grievance box in her housing unit. However, Plaintiff never received a further response to the resubmitted grievance.

43.     Plaintiff also told multiple IDOC correctional officers in X House and Housing Block 6, including Officer Ledbetter, that she did not want to be induced. Several of the correctional officers, including Officer Ledbetter, told Plaintiff that they did not care that she did not want to be induced. Several correctional officers, including Officer Ledbetter, also told Plaintiff that it was prison policy that all pregnant inmates had scheduled inductions and there were no exceptions. Upon information and belief, no correctional officer ever escalated Plaintiff's concerns within IDOC or otherwise took steps to address her pleas to not be forced to submit to an induction of labor.

44.     On or around February 6, 2024, Plaintiff attended a prenatal visit at the SIU Center for Maternal-Fetal Medicine, a specialist office affiliated with HSHS St. John's Hospital, where she was expected to give birth. At this visit, Plaintiff was seen by a nurse practitioner. During the visit, the Nurse Practitioner informed Plaintiff that the date for her induction of labor would be set very soon, despite the fact that her estimated due date was still three weeks away. On information and belief, Officer Cox took Plaintiff to and from this appointment.

45.     When Plaintiff told the Nurse Practitioner she did not want to be induced, the Nurse

Practitioner informed her that it was something that was done with all pregnant IDOC prisoners. The Nurse Practitioner told Plaintiff that once an induction date was entered into the system, prison policy dictated that the induction date could not be altered.

46.    In short, Plaintiff told everyone at Logan who knew about her upcoming induction that she did not want to be induced. At no point did Plaintiff ever give consent to induction of her labor, either verbally or in writing.

47.    At no point did any IDOC or Wexford staff tell Plaintiff that it was impossible to honor her wish to enter labor spontaneously—only that induction was unalterable prison policy. And no one at Logan explained why Plaintiff could not be transported to the hospital if and when she went into labor spontaneously. On information and belief, inmates at Logan were regularly transported to the hospital in the event of a medical emergency.

48.    On or around February 9, 2024, Plaintiff had another appointment with Dr. Morisetty. At this appointment, Plaintiff was told that induction of her labor had been scheduled for February 12, when she would be exactly 38 weeks pregnant based on her estimated due date.

49.    Numerous IDOC and Wexford staff, including Nurse Estes, told Plaintiff that once her induction date was set, it could not be changed or cancelled.

50.    Plaintiff was stressed, anxious, and depressed during the entire time she was pregnant at Logan because of her concerns about being induced against her will. Plaintiff had never felt so scared during a pregnancy. Plaintiff felt like she was "in hell" being pregnant while incarcerated at Logan because her expressed wish not to be induced was being disregarded by all the IDOC and Wexford staff she encountered.

51.    The policy requiring scheduled induction of labor for all pregnant inmates in IDOC custody, without exception, was consistent with the personal experiences Plaintiff learned about

from other individuals incarcerated at Logan and Decatur alongside her. In fact, there were multiple inmates in Plaintiff's housing block in Logan who also had scheduled inductions and regularly complained about the prison's policy requiring induction to IDOC staff in front of and with Plaintiff. Furthermore, once Plaintiff transferred to the "Moms and Babies" program at Decatur, multiple inmates shared stories of their traumatic forced inductions with her, including one inmate who was induced while her baby was premature, and the baby had to be hospitalized for five weeks after birth.

D. **Medical Personnel Later Relied on a Questionable Gestational Diabetes Diagnosis as a Pretextual Medical Reason for Plaintiff's Induction.**

52.     During one of her prenatal appointments at Logan, Plaintiff was told she would be tested for gestational diabetes in the near future, and that she would be given advance notice of the date of the test.

53.     Plaintiff was informed about her initial scheduled gestational diabetes test in advance. Plaintiff fasted in advance of this planned test, as correctional officers did not bring her a plate for dinner or breakfast during the evening or morning before the test. However, this planned gestational diabetes test was cancelled because of a snowstorm that shut down the on-site medical clinic at Logan.

54.     Logan medical staff rescheduled Plaintiff's gestational diabetes test for January 25, 2024, without providing any advance notice to Plaintiff of this rescheduled test. This time, early in the morning before the test, correctional officers gave Plaintiff a breakfast consisting of a plate of pancakes with syrup, jelly, and orange juice, all of which she ate. Throughout the same morning, Plaintiff also consumed several cookies and Kool-Aid; in fact, she was still eating one of the cookies on her way to the medical clinic. It was not until Plaintiff reached the clinic that she was told she was there to be tested for gestational diabetes. Plaintiff told Dr. Morisetty and a nurse that

she had not fasted and had consumed a lot of sugary foods that morning, but they proceeded to conduct the test anyway.

55.     Based on the results of the January 25 test, Dr. Morisetty told Plaintiff that she had gestational diabetes. Dr. Morisetty told Plaintiff that this gestational diabetes diagnosis was "another reason" for inducing her labor, in addition to the prison's general induction policy.

56.     Following this gestational diabetes diagnosis, Dr. Morisetty ordered that Plaintiff stay in the prison infirmary for a week for monitoring. During that week, nurses tested Plaintiff's glucose levels three times a day. Throughout this period, from January 26, 2024, to February 1, 2024, Plaintiff's glucose levels were always normal or even low. During this week, Nurse Raisha Milliner remarked to Plaintiff that she did not know why Plaintiff was in the infirmary because Plaintiff's blood sugar levels were normal.

57.     During her time in the infirmary, Plaintiff filed a second grievance that stated that she did not want to be induced. Because Plaintiff could not leave her room in the infirmary, she gave her grievance to a correctional counselor with the last name Baker, who on information and belief submitted Plaintiff's grievance. Plaintiff never received a response to this second grievance. Once she left the infirmary and learned her induction date, Plaintiff also wrote and submitted a third grievance in the dedicated box in her housing block, that again stated that she did not want to be induced. Plaintiff also never received a response to this third grievance.

58.     After her week in the infirmary, Plaintiff continued to have blood glucose tests nearly every day, and sometimes multiple times a day, through the date she was induced. Plaintiff's glucose levels remained normal or low in each of these tests.

59.     Dr. Morisetty prescribed Plaintiff a "special diet" because of the diagnosis of gestational diabetes. Plaintiff's "special diet" involved taking away the extra food usually given to

pregnant inmates, leaving Plaintiff frequently hungry. In fact, Plaintiff passed out twice during her time at Logan from nutritional deficiencies. When Plaintiff asked for more food, she was told she could not have it because of her diagnosis of gestational diabetes.

60.    Plaintiff was never prescribed any medication for her diagnosis of gestational diabetes.

61.    At Plaintiff's appointment at the SIU Center for Maternal-Fetal Medicine on or around February 6, 2024, the Nurse Practitioner reviewed Plaintiff's medical records from Logan, and informed Plaintiff that her blood glucose levels were normal. In speaking with Plaintiff, the Nurse Practitioner did not identify any medical reason requiring an early induction of Plaintiff's labor, only stating that inductions are scheduled as a matter of policy for all IDOC inmates. The Nurse Practitioner's written notes from that appointment confirmed that Plaintiff's blood glucose levels were all "at goal." Nevertheless, the notes also stated that induction of Plaintiff's labor was being scheduled for 38 weeks gestation "due to uncontrolled [gestational diabetes]." No further explanation was given—either in Plaintiff's medical records, or in counseling by any of her medical providers—as to the direct contradiction between the statement that Plaintiff's blood glucose levels were all "at goal" and the statement that her diagnosed gestational diabetes was "uncontrolled." On information and belief, Officer Cox drove Plaintiff to and from this appointment.

62.    Induction of labor at 38 weeks gestation is not recommended by the American College of Obstetricians and Gynecologists ("ACOG") or the Society for Maternal-Fetal Medicine ("SMFM") when a patient has gestational diabetes which is well-controlled with diet and exercise

alone, without requiring medication.[2] On information and belief, to the extent that Plaintiff had gestational diabetes during her third pregnancy, it was well-controlled with diet and exercise alone.

63.    Even in scenarios where induction is generally recommended due to gestational diabetes, ACOG and SMFM guidance makes clear that individualized evaluation on the timing of delivery is necessary.[3] Furthermore, ACOG guidance also makes clear that healthcare professionals have an ethical obligation to respect a patient's right to refuse recommended treatment, even when pregnant.[4]

64.    Other than the questionable diagnosis of gestational diabetes, Plaintiff was at no point informed of any other medical issue that could present a reason for induction of her labor at any time, let alone before her due date.

### E. Plaintiff's Labor Was Induced at 38 Weeks Gestation on February 12, 2024, Against Her Wishes and Repeated Pleas.

65.    Plaintiff had a difficult time sleeping the night before her scheduled induction because she was so anxious and fearful. Early in the morning of February 12, 2024, Plaintiff was woken up to be taken to the hospital for the induction. Plaintiff told the correctional officer who woke her up that she did not want to go and did not want to be induced. The correctional officer

---

[2] *See, e.g.*, American College of Obstetricians and Gynecologists Committee on Obstetric Practice & Society for Maternal-Fetal Medicine, *ACOG Committee Opinion Number 831: Medically Indicated Late-Preterm and Early-Term Deliveries* (July 2021), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/07/medically-indicated-late-preterm-and-early-term-deliveries.

[3] *Id.*

[4] American College of Obstetricians and Gynecologists, *ACOG Committee Opinion Number 664: Refusal of Medically Recommended Treatment During Pregnancy* (June 2016), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2016/06/refusal-of-medically-recommended-treatment-during-pregnancy ("Pregnancy is not an exception to the principle that a decisionally capable patient has the right to refuse treatment, even treatment needed to maintain life. Therefore, a decisionally capable pregnant woman's decision to refuse recommended medical or surgical interventions should be respected.").

told Plaintiff once again that she did not have a choice, and that correctional officers were already on their way to come get her and take her to the hospital for the induction.

66.    Shortly thereafter, two correctional officers, one male and one female, picked Plaintiff up to transport her in a van to HSHS St. John's Hospital for the induction of her labor. On information and belief, Officer Cox was the female officer and Officer Thomack was the male officer who took Plaintiff to the hospital and stayed with Plaintiff during the induction of her labor and delivery. Plaintiff told Officers Cox and Thomack during the van ride that she did not want to be induced. Officer Cox expressed that she understood Plaintiff's concerns, but said there was nothing the correctional officers could do to stop the induction from taking place. Plaintiff cried throughout the van ride to the hospital.

67.    After Plaintiff arrived at HSHS St. John's Hospital, Dr. Aarthi Arab, M.D. came into her hospital room to explain the induction process. Dr. Arab said that he likely would need to break Plaintiff's water, and also stated that he may need to sweep Plaintiff's "membranes." Plaintiff did not know what sweeping her "membranes" meant, nor did the doctor explain what it meant or how it differed from breaking her water. Plaintiff told Dr. Arab that she did not want to be induced. The doctor responded that "the rules" for IDOC inmates required him to induce her right away.

68.    During this conversation with Dr. Arab, Officer Thomack interjected that Plaintiff should not expect to have rights while in prison.

69.    Plaintiff was given an epidural and then an IV infusion of Pitocin to induce her labor.

70.    At no point did Plaintiff provide written or oral consent to the induction of her labor to Dr. Arab or any other staff at HSHS St. John's Hospital.

71.    Not long after Plaintiff was administered Pitocin, Dr. Arab returned to Plaintiff's room and stated that because Plaintiff was not dilating quickly enough, he was going to break her water. Plaintiff was dilated several centimeters at this point, and she had begun having contractions.

72.    Dr. Arab broke Plaintiff's water by inserting a small hook through Plaintiff's cervix and puncturing the amniotic sack.

73.    Dr. Arab then inserted his hand inside Plaintiff's vagina against her cervix. He did not tell Plaintiff what he was doing before he inserted his hand. Plaintiff attempted to move away from the doctor by scooting back on the hospital bed, but the doctor kept his hand inside of Plaintiff. Plaintiff felt a lot of pressure and sharp pain inside her vaginal canal. This pain was worse than the subsequent birth itself.

74.    Plaintiff told Dr. Arab that he was hurting her. Dr. Arab responded by telling Plaintiff that she was "OK" despite her visible fear and discomfort, and that this procedure would "move things along." Dr. Arab did not stop despite Plaintiff's protest.

75.    When Dr. Arab removed his hand, it was covered in blood. Dr. Arab told Plaintiff that this was "the bloody show," but did not explain what that meant. Plaintiff was frightened by all the blood and the doctor's unexplained reference to a "bloody show."

76.    Within hours of her arrival at the hospital on February 12, 2024, Plaintiff gave birth to a baby girl.

77.    After labor, Plaintiff continued to feel physical pain where Dr. Arab had inserted his hand. Plaintiff had significantly more vaginal pain than she had after prior births.

78.    Plaintiff also bled significantly more postpartum than she had with prior births. Plaintiff continued to bleed and wear diapers to catch the blood for weeks after she left the hospital.

79.    Plaintiff felt depressed, hopeless, and violated by the experience of having her labor induced against her will.

80.    On or around February 14, 2024, Plaintiff was transferred to IDOC's Decatur Correctional Center, where she was placed in the "Moms and Babies" prison nursery program. The "Moms and Babies" program allowed Plaintiff to be with and care for her newborn during her remaining months in prison.

81.    Plaintiff saw a doctor over a month after being transferred to the Decatur facility who noted "copious" vaginal discharge. Plaintiff was prescribed antibiotics to treat an infection that developed after giving birth.

82.    During her time at Decatur, Plaintiff spoke with the current warden at the facility, whose last name on information and belief was Williams. Plaintiff told Warden Williams about her traumatic experience with induction of her labor. Warden Williams told Plaintiff that her induction was "protocol."

83.    Plaintiff was released from IDOC custody on or around June 5, 2024.

84.    Several months later, in November 2024, Plaintiff was hospitalized for excessive bleeding and pelvic pain. Plaintiff ultimately underwent a surgical procedure for a burst ovarian cyst. At that time, medical staff asked Plaintiff if she had experienced any "intrusions" to her cervix, and Plaintiff explained her traumatic experience with having her membranes broken during induction of labor earlier that year.

F.    **During Plaintiff's Incarceration at Logan, Wexford, Dr. Morisetty, and Nurse Estes Voluntarily Had Assumed Responsibility for the Provision of Medical Care to Inmates Under the Direction and Control of IDOC.**

85.    On information and belief, at all times relevant to the events giving rise to the claims asserted herein, Wexford had a contract with IDOC whereby Wexford was the primary provider of medical care to inmates incarcerated at IDOC facilities, including Logan.

86.     Pursuant to this contract, Wexford was responsible for retaining and supervising medical staff at Logan involved in the furnishing of medical care to inmates, including Plaintiff. Dr. Morisetty and Nurse Estes were medical providers who provided medical care on behalf of Wexford at Logan during the period of Plaintiff's incarceration there.

87.     In its then capacity as the primary provider of medical care in IDOC facilities, Wexford maintained rules, regulations, policies and procedures for the medical diagnosis, medical treatment, and coordination of medical care for inmates at Logan. Wexford's policies and procedures were implemented by and through its staff, including Dr. Morisetty and Nurse Estes, and with the support of IDOC personnel.

88.     Wexford, Dr. Morisetty, and Nurse Estes provided medical care to inmates at Logan, including Plaintiff, under the direction and control of IDOC. On information and belief, pursuant to the contract between IDOC and Wexford in effect at the time of the events giving rise to the claims asserted herein, IDOC also had authority to implement policies, procedures, rules, and practices governing the provision of medical care in IDOC facilities, and to approve Wexford's selection and retention of medical staff.

89.     On information and belief, by virtue of his position as IDOC's Medical Director, Dr. Bowman was responsible for overseeing the provision of medical services across the state prison system and providing direction to all medical staff at correctional facilities. Dr. Bowman also was responsible for designating and supervising administrators to oversee the operations and activities of the health care units at each correctional facility, including Logan.

90.     On information and belief, by virtue of her position as an IDOC Regional Health Services Coordinator, Defendant Johnson was responsible for overseeing medical policies and the training of medical staff at Logan, including medical policies executed by Wexford and IDOC

staff.

91.     By virtue of her position as Acting Warden of Logan and IDOC's Chief of Women and Family Services, Defendant Eddy was responsible for overseeing prison policies and administration at Logan, including the execution of medical policies and the provision of medical care by Wexford and IDOC staff.

## COUNT I
### 75 ILCS 55/1-20 – Violation of the Illinois Reproductive Health Act
### (Asserted by Plaintiff Against All Defendants)

92.     Each of the preceding paragraphs of this Complaint is incorporated herein.

93.     The Illinois Reproductive Health Act provides individuals with the fundamental right to make autonomous decisions about their own reproductive health, including the fundamental right to refuse reproductive health care, which includes maternity care. 775 ILCS 55/1-15(a); 775 ILCS 55/1-10. The Act also protects the fundamental right of every individual who becomes pregnant to continue the pregnancy and give birth, and to make autonomous decisions about how to exercise that right. 775 ILCS 55/1-15(b). The Act prohibits state actors from denying, restricting, interfering with, or discriminating against an individual's exercise of these fundamental rights, including individuals under state custody, control, or supervision. 775 ILCS 55/1-20(a)(1).

94.     On information and belief, Defendants IDOC and Wexford maintained and implemented a policy, custom, and/or practice of inducing the labor of pregnant inmates regardless of whether individual inmates consented to induction or whether induction was medically necessary.

95.     All Defendants, acting individually or in concert with one another, denied, restricted, interfered with, or discriminated against Plaintiff's exercise of her fundamental rights under the Illinois Reproductive Health Act by ordering and/or facilitating the forced induction of

Plaintiff's labor against her will, consistent with the induction policy and practice. Defendants denied, restricted, interfered with, or discriminated against Plaintiff's right to refuse reproductive health care, including her right to refuse induction. Defendants also denied, restricted, interfered with, or discriminated against Plaintiff's right to make autonomous decisions about exercising her right to give birth, including her right to decide to go into labor spontaneously.

96.    Plaintiff objected, and never voluntarily consented, to induction of her labor. Defendants knew that Plaintiff did not consent to being induced because she repeatedly told IDOC and Wexford staff—including Dr. Morisetty, Nurse Estes, Officer Thomack, Officer Ledbetter, Officer Cox, and/or Counselor O'Bryan—that she did not want to be induced, and because she filed grievances stating that she did not want to be induced.

97.    As IDOC administrators, Defendants Bowman, Johnson, and Eddy were ultimately responsible for the adoption and execution of the prison's induction policy and practice, including Plaintiff's forced induction.

98.    The induction of Plaintiff's labor was not consistent with accepted standards of clinical practice, and was neither evidence-based nor narrowly tailored for the limited purpose of protecting her health. Induction of Plaintiff's labor at 38 weeks when her alleged diagnosis of gestational diabetes was well-controlled with diet and exercise alone was not consistent with professional standards of care. Furthermore, forcing Plaintiff to undergo an induction of labor without her consent was not consistent with professional standards of care.

99.    Despite Plaintiff's repeated protests and explicit non-consent, Defendants deliberately, wantonly, and willfully caused Plaintiff to be induced against her will.

100.    As a result of the forced induction, Plaintiff suffered physical and emotional harm.

101.    Because Defendants acted deliberately, wantonly, and willfully in disregard of

Plaintiff's rights under the Illinois Reproductive Health Act as set forth above, Plaintiff also seeks an award of punitive damages under the Act.

## COUNT II
## 42 U.S.C. § 1983 – Violation of the Right to Refuse Medical Treatment (Fourteenth Amendment)
**(Asserted By Plaintiff Against Steven Bowman, Lisa Johnson, Melinda Eddy, Vidya Sagar Rao Morisetty, Cassie Estes, Richard Ledbetter, Susan Cox, Michael Thomack, and Chelsey O'Bryan)**

102.    Each of the preceding paragraphs of this Complaint is incorporated herein.

103.    The Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

104.    The Supreme Court has recognized that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment" under the Fourteenth Amendment. *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). The Court also has held that prisoners retain a liberty interest in refusing medical treatment while incarcerated. *See Washington v. Harper*, 494 U.S. 210, 221–22 (1990). The Seventh Circuit has recognized both the right to refuse medical treatment and the right to informed consent as a corollary of that right. *Knight v. Grossman*, 942 F.3d 336, 342 (7th Cir. 2019).

105.    On information and belief, IDOC and Wexford maintained and implemented a policy, custom, and/or practice of inducing the labor of pregnant inmates regardless of whether individual inmates consented to induction or whether induction was medically necessary.

106.    At all times during her pregnancy in 2023 and 2024, Plaintiff was competent to make medical decisions for herself.

107.    Plaintiff never consented to induction of her labor. Indeed, Plaintiff repeatedly objected to being induced. Defendants Morisetty, Estes, Ledbetter, Cox, Thomack, and O'Bryan

all knew that Plaintiff did not consent to being induced because she repeatedly told them that she objected. Plaintiff also filed formal prison grievances stating that she did not want to be induced.

108.    On information and belief, Defendants Bowman, Johnson, and Eddy were involved in establishing and/or permitting the execution of the IDOC and Wexford policy, custom, and/or practice of requiring scheduled inductions for pregnant inmates in IDOC custody, regardless of individual consent or medical need. Plaintiff's non-consensual, medically unnecessary induction was the result of this policy, custom, and/or practice.

109.    On information and belief, pursuant to the IDOC and Wexford policy, custom, and/or practice of requiring scheduled inductions for pregnant inmates, Defendant Dr. Morisetty ordered that Plaintiff be scheduled for an induction at HSHS St. John's Hospital at 38 weeks gestation despite knowing that Plaintiff did not consent to induction. On information and belief, Defendant Nurse Estes facilitated or participated in carrying out Dr. Morisetty's order to schedule an induction for Plaintiff.

110.    On information and belief, pursuant to the IDOC and Wexford policy, custom, and/or practice of requiring scheduled inductions for pregnant inmates, Officers Ledbetter, Cox, and Thomack enabled and/or facilitated Plaintiff's non-consensual induction by (1) failing to escalate Plaintiff's complaints that she did not want to be induced, (2) failing to inform Plaintiff that she had the right to refuse medical treatment and did not need to be induced, and/or (3) taking Plaintiff to her scheduled induction.

111.    On information and belief, pursuant to the IDOC and Wexford policy, custom, and/or practice of requiring scheduled inductions for pregnant inmates, Counselor O'Bryan enabled and/or facilitated Plaintiff's non-consensual induction by (1) failing to escalate Plaintiff's complaints that she did not want to be induced, (2) failing to inform Plaintiff that she had the right

to refuse medical treatment and did not need to be induced, and/or (3) disregarding her grievance requesting that she not be induced.

112.    On information and belief, the medical provider Defendants—Dr. Morisetty and Nurse Estes—consciously or recklessly disregarded that induction of labor at 38 weeks gestation was not medically necessary for Plaintiff given that her alleged diagnosis of gestational diabetes was well-controlled with diet and exercise alone. Those Defendants also consciously disregarded Plaintiff's lack of consent and overt objection to induction.

113.    On information and belief, the Logan correctional officer and/or counselor Defendants—Officer Ledbetter, Officer Cox, Officer Thomack, and Counselor O'Bryan—enabled and/or facilitated Plaintiff's induction based on the policy, custom, and/or practice of inducing labor for pregnant IDOC inmates, and not based on any order from a medical provider that induction was medically necessary for Plaintiff. In facilitating Plaintiff's induction, those Defendants also consciously disregarded Plaintiff's lack of consent and overt objection to induction.

114.    On information and belief, the IDOC administrator Defendants—Dr. Bowman, Ms. Johnson, and Ms. Eddy—consciously or recklessly disregarded the significant risk that the IDOC and Wexford policy, custom, and/or practice of inducing labor for pregnant IDOC inmates would subject inmates to medical treatment against their will and/or without medical or penological need.

115.    The induction of Plaintiff's labor was not reasonably related to any legitimate penological interest. Rather, the policy, custom, and/or practice of inducing labor for pregnant IDOC inmates imposed a blanket restriction on the rights of pregnant inmates without individualized assessment of medical need and individual consent. Further, ready and obvious alternatives to this policy and practice—including providing transportation to the hospital in the

event of spontaneous labor and ensuring adequate onsite medical care in case of medical emergencies—would have fully accommodated Plaintiff's rights.

116.    Defendants, acting individually or in concert with one another, acted with deliberate indifference to Plaintiff's substantive due process right to refuse medical treatment and violated that right when they caused her to be induced against her will.

117.    As a result of the forced induction, Plaintiff suffered physical and emotional harm.

118.    Because Defendants acted intentionally, recklessly, and/or with deliberate indifference to the consequences of their actions as set forth above, Plaintiff also seeks an award of punitive damages.

## COUNT III
## 42 U.S.C. § 1983 – Violation of the Right to Refuse Medical Treatment (Fourteenth Amendment)
### (Asserted By Plaintiff Against Wexford Health Sources, Inc.)

119.    Each of the preceding paragraphs of this Complaint is incorporated herein.

120.    At all relevant times, Wexford contracted with IDOC to provide medical care to inmates incarcerated at all IDOC facilities, including Logan. In this capacity, Wexford was responsible for creating, implementing, overseeing, and supervising policies and procedures governing the provision of medical care to inmates incarcerated at Logan.

121.    On information and belief, Wexford had a longstanding, pervasive policy, custom, and/or practice of requiring scheduled inductions of labor for pregnant inmates in IDOC custody, regardless of individual consent or medical need. Every pregnant or recently pregnant inmate that Plaintiff encountered during her incarceration at Logan and Decatur reported they had an induction scheduled, regardless of individual consent or medical need. Plaintiff was told numerous times that scheduled induction of labor was a matter of prison policy.

122.    On information and belief, Plaintiff's non-consensual, medically unnecessary

25

induction was the result of the Wexford policy, custom, and/or practice requiring scheduled induction for pregnant inmates in IDOC custody.

123.    On information and belief, Wexford consciously or recklessly disregarded the significant risk that its policy, custom, and/or practice of inducing labor for pregnant IDOC inmates would subject inmates to medical treatment against their will and/or without medical or penological need.

124.    As a result of the forced induction, Plaintiff suffered physical and emotional harm.

125.    Because Wexford acted intentionally, recklessly, and/or with deliberate indifference to the consequences of its actions as set forth above, Plaintiff also seeks an award of punitive damages.

**JURY DEMAND**

126.    Plaintiff Amy Hicks demands a jury trial on all issues triable by jury.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff Amy Hicks hereby respectfully requests that this Court:

A.  Declare that Defendants unlawfully violated Plaintiff's rights under the Illinois Reproductive Health Act and the Fourteenth Amendment of the United States Constitution when they forced induction of her labor against her will;

B.  Enter a judgment in her favor and against Defendants;

C.  Award Plaintiff compensatory damages, punitive damages, and attorneys' fees and costs; and

D.  Award any other relief this Court deems just and appropriate.

Dated: January 8, 2026                    Respectfully submitted,


                                          */s/ Jennifer L. Greenblatt*
                                          Jennifer L. Greenblatt

                                          Emily Werth
                                          Allison Siebeneck
                                          ROGER BALDWIN FOUNDATION OF ACLU, INC.
                                          150 N. Michigan Ave., Suite 600
                                          Chicago, IL 60601
                                          Telephone: (312) 201-9740
                                          Facsimile: (312) 288-5225
                                          ewerth@aclu-il.org
                                          asiebeneck@aclu-il.org

                                          Jennifer L. Greenblatt
                                          Rami N. Fakhouri
                                          Sarah Kinter
                                          Julia Zasso
                                          GOLDMAN ISMAIL TOMASELLI
                                          BRENNAN & BAUM LLP
                                          191 N. Wacker Dr., Suite 3000
                                          Chicago, IL 60606
                                          Telephone: (312) 881-6000
                                          Facsimile: (312) 881-5191
                                          jgreenblatt@goldmanismail.com
                                          rfakhouri@goldmanismail.com
                                          skinter@goldmanismail.com
                                          jzasso@goldmanismail.com

                                          *Attorneys for Plaintiff Amy Hicks*